ANN M. ROBINSON, Plaintiff-Appellee and Cross-Appellant, *v.* WYLIE W. ROBINSON, Defendant.—(EARL J. ROBINSON *et al.*, Defendants-Appellants and Cross-Appellees.)

Second District    Nos. 80-85, 80-182 cons.

Opinion filed September 18, 1981.

440

William F. Bochte, of Elburn, and Michael J. Hanson, of Ketchum and Hanson, of St. Charles, for appellants.

William J. Foote and James W. Stephenson, both of Dreyer, Foote & Streit Associates, of Aurora, for appellee.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

This action was brought by the plaintiff, Ann M. Robinson, to obtain a dissolution of marriage from Wylie Robinson, and against his parents, Earl J. and Alice M. Robinson, to establish her rights in certain property owned by them, known as the Johnson Road property. As the principal parties of this action have the same surnames, to save time and space we will refer to them usually by their given names.

The novel question presented by this appeal is whether one who improves real property which she knows to be owned by others, who neither request nor encourage the improvement but merely give their permission for the improvement, is entitled to restitution. There are nine other issues presented by this appeal.

The trial on the dissolution issues was on a bifurcated basis with the grounds being tried first. The court found Ann proved grounds for dissolution without contest by Wylie. Thereafter, the other dissolution issues were set for hearing along with five counts in which Ann alleged an interest in the real estate owned by Earl and Alice. Prior to trial, Wylie moved for a change of venue, and Earl and Alice moved for a severance

from the dissolution action and for a change of venue. Those motions were denied.

After hearing all of the evidence, the able and experienced trial judge made a finding that all issues of credibility are found against Earl and Wylie, based upon the many inconsistencies in their testimony. The trial court entered judgment for dissolution of marriage finding that both husband and wife are self-supporting, in good health, and have sufficient income and assets that neither was entitled to maintenance. The trial court gave custody of the two minor children to Ann and required Wylie to pay child support, and found that he was then $980 in arrearage. The trial court determined that Wylie's Teacher's Retirement Pension Fund was a marital asset and awarded Ann one-half of its current value and also awarded Ann $3,000 in legal fees. The judgment also assigned to the parties various items of furniture, furnishings, other personal property, automobiles, bank accounts and insurance policies.

The judgment further determined that Ann and Wylie each had a one-half interest in the house constructed on the land owned by Earl and Alice and known as the Johnson Road property. The court valued the house and improvements at $71,000 and determined that there was a construction loan for the house amounting to $15,000 and that the value of the lot upon which the house was constructed was $12,000.

The judgment went on to provide for the disposition of the Johnson Road property by two alternate methods to be determined by the election of Earl and Alice. The first method was that the house and lot be sold, sale expenses be paid, the construction loan be paid, then Earl and Alice be paid the value of the land and the remaining sale proceeds be divided between Ann and Wylie. A lien was imposed on Wylie's one-half in favor of Ann in an amount equal to the court's determination of the amount owed for her child support arrearages, attorney's fees and her one-half interest in Wylie's Teacher's Retirement Pension Fund.

Alternatively, the judgment provided that if Earl and Alice do not elect to have the house and lot sold then they are to pay Ann $28,000 representing her one-half interest in the house, and pay the bank $7,500 representing one-half of the amount due on the construction loan and, further, Wylie was required to hold Ann harmless and indemnify her as to any liability on the other $7,500 due on that loan. This alternative also provided that Ann would have a lien on Wylie's one-half interest in the house in the amount he was required to pay her for child-support arrearages, attorney's fees and one-half of the teacher's retirement fund. Upon receipt of the above-described funds, Ann was to quitclaim her interest in the property to Earl and Alice. They, however, rejected both alternatives. The trial court appointed a receiver for the property, but the receiver declined appointment.

All of the parties then took this appeal.

To determine the principal issues in this case, it is necessary to recite the facts in some detail to determine the relationship of the parties and the rights and obligations flowing therefrom.

Wylie grew up on a farm in Kendall County. He is the only child of Earl and Alice. They owned the farm upon which they lived and, in addition, owned another farm of 160 acres some five miles away known as the Johnson Road property, which is the focus of the controversy here.

Wylie and Ann were married in 1966. Ann was a registered nurse and Wylie was attending college and graduated in 1968. Soon thereafter they moved to Aurora where Ann worked as a nurse and Wylie was employed as a school teacher. They lived off of Wylie's salary and saved Ann's salary to build a home. Wylie wanted to move back to the country.

Early in the spring of 1969, Wylie had a conversation with his father, Earl, in which Wylie asked his father if he and Ann could build their home on the Johnson Road property. Earl agreed. Earl told his wife, Alice, that Wylie had asked if he and Ann could build their home on the Johnson Road property. Earl told Alice that he was agreeable, and Alice also consented. Wylie told Ann that his father had agreed to let them build their home on the Johnson Road property. Earl and Alice were pleased because Wylie would be more available to help them with work on the farm.

Wylie testified he selected the site for the house. Earl advised him that down at the end of the lane near Johnson Road was an appropriate place to build. Wylie drew the plans for the house. He surveyed and staked out the site. A registered land surveyor testified that the landscaped site upon which the house is built is exactly one acre, although Wylie testified he did not stake out any particular size site.

Wylie and Ann had saved $4,000. They borrowed $18,000 from the local bank as a construction loan and told the president of the bank that when they completed the home that the land would be theirs and a regular mortgage would be placed on the property for purposes of security. The note was renewed on a yearly basis, and monthly payments reduced the debt to $15,000.

Wylie and Ann began construction of the house in the spring of 1969 and occupied it in 1970. The construction work was done mainly by Wylie with substantial help from friends and family including Earl, Alice and Ann's father. Ann sanded and finished woodwork and cabinets. After the home was occupied, additional improvements in the amount of $5,000 were made. These included carpeting, drapes, kitchen cabinets, linoleum and paint.

All of the parties knew that the house was Wylie's and Ann's home and treated it as such. They did all of the landscaping and planted shrub-

bery. They repaired it and maintained it. They made all of the loan payments and treated the interest thereon as a deduction on tax returns. They insured the house with a homeowner's policy. They had the only keys to the house and never paid or were asked for rent on it. The one connection Earl and Alice had with the house was that it was included on the farm tax bill since the lot was not subdivided. Earl and Alice paid the real estate tax bill. In exchange for that payment, Wylie worked additional time for his parents on their farm.

The bank president drove to the property and inquired if the house was completed so that Wylie and Ann could obtain a conventional mortgage. Wylie, thereafter, obtained an estimate of the cost of a survey which was several hundred dollars. He and Ann did not have those funds, and the matter was dropped.

There was no written agreement between the young and older Robinsons as to a transfer of title to the property. However, Wylie and his parents had many oral dealings over the years. They were very close. Wylie borrowed money from his parents by oral agreement. He not only had access to his parents' checkbook, but the right to sign checks. He could charge items to his parents' accounts and then repay them. The younger Robinsons and the older Robinsons exchanged services and assistance in the old-fashioned country manner. Wylie worked for his parents on their farm each year and received a share of the farm income. Over the years he contributed a substantial amount of his time and knowledge to the construction of various farm improvements on his parents' farm.

Marital discord arose in 1977 and Wylie moved to his parents' home where he resided at the time of the hearing. From the relationship of the parties it can thus be seen that the younger Robinsons would have every expectation of eventual ownership of the home they constructed. However, the testimony was in strong disagreement on this point.

Ann testified that she and Wylie had conversations with Earl and Alice with respect to transferring the lot to her and Wylie. She said the matter was discussed in general terms on more than one occasion. According to Ann, it was made understood to Wylie and her that the house was sitting on property that would be theirs. She testified that Earl said they would sign it over to them.

Wylie testified that his father did not promise to transfer the house or sell it to him. His mother never promised anything, and neither parent ever said he would inherit all their property. Wylie acknowledged that the agreement was that he could live in the house.

Earl testified that he never had a conversation with Wylie and Ann about transferring the property to them. He never promised to transfer title or give Wylie the property, and he never told Wylie he was going to leave him the property by will or inheritance.

Alice testified that her husband gave Wylie and Ann permission to build a building, but that there were no representations that they were going to transfer an interest in the property to the younger Robinsons.

The trial judge put the following questions to Earl:

"Q All right. Mr. Robinson, when you allowed Ann and Wylie to put this $23,000 in the house, did you think they were making a gift to you of $23,000?

A No, I didn't—

Q What did you think they were doing with the $23,000?

A I don't know. But anybody builds on anything they don't have it's title it's their own hard luck."

* * *

Q When Wylie asked you could he build a house, whom did you understand he was building the house for?

A Building it for himself was the understanding. It was the second farm house."

The following questions were put to Alice:

"Q Now, Mrs. Robinson, you were aware of the fact that your husband had given Wylie and Ann permission to build a building?

A Yes.

Q Okay. Did you think they were making a gift of this building to you?

A No.

Q Then why were they putting this money into your property as far as you were concerned.

A For a house for them."

The trial judge concluded that it would unjustly enrich Earl and Alice to gain the house without compensation to Ann.

■■■ A person who has been unjustly enriched at the expense of another is required to make restitution to the other. (Restatement of Restitution §1, at 12 (1937).) A person is enriched if he has received a benefit. A person is unjustly enriched if the retention of the benefit would be unjust. A person obtains restitution when he is restored to the position he formerly occupied either by the return of something he formerly had or by the receipt of its equivalent in money.

After hearing all of the evidence in this case, the trial court determined that Ann had an interest in the improvements made on the Johnson Road property. The court's rationale for the decision was that the evidence established that Earl and Alice had been unjustly enriched by the improvements made on the Johnson Road property. In making this decision, the court stated that it was based on theories that are available to the court in equity.

Earl and Alice argue that the evidence at trial did not establish

recovery under a theory of unjust enrichment. They argue that as a general rule, improvements of a permanent character, made upon real estate, and attached thereto, without consent of the owner of the fee, by one having no title or interest, become a part of the realty and vest in the owner of the fee. (*Williams v. Vanderbilt* (1893), 145 Ill. 238.) But, as the supreme court pointed out years ago:

"* * * [C]ourts of equity have not hesitated to soften the harshness and rigor of the rule of law, when the circumstances of the case and the relation of the parties required it to be done to meet the ends of justice." *Cable v. Ellis* (1887), 120 Ill. 136, 152.

In *Olin v. Reinecke* (1929), 336 Ill. 530, 534, the court said:

"In equity, however, if the owner stands by and permits another to expend money in improving his land he may be compelled to surrender his rights to the land upon receiving compensation therefor, or he may be compelled to pay for the improvements. In such cases there is always some ingredient which would make it a fraud in the owner to insist upon his legal rights. Such an ingredient may consist in the owner encouraging the stranger to proceed with the improvement, or where one party acts ignorantly and without the means of better information and the other remains silent when it is in his power to prevent the expenditure of the money under a delusion. It has been held in such cases that to permit one to take advantage of the mistake of another would be revolting to every sentiment of justice. [Citations.] The exercise of such a judicial power, however, unless based upon some actual or implied culpability on the part of the party subjected to it, is a violation of constitutional rights."

In *Pope v. Speiser* (1955), 7 Ill. 2d 231, 240, where the plaintiff placed valuable improvements on the defendant's farm with the knowledge and consent of the defendant and after repeated statements by the defendant that the farm would belong to the plaintiff upon the defendant's death, the court granted plaintiff an equitable lien in the land, after the defendant attempted to sell the farm to a third person.

■■ These cases support the trial court's ruling granting Ann an interest in the Johnson Road property. The improvements were made with the knowledge, co-operation and approval of Earl and Alice. They were the major investment a young couple would ever be expected to make. The relationship of the parties and their dealings would lead one to believe that the home that was constructed would be a permanent home for Wylie and Ann. The court did not err in granting Ann an interest in the property.

■■ Earl and Alice contend further that the interest created was at most only a license. They point out that a license in respect to real property is

permission to do an act or a series of acts upon the land of another without possessing any estate or interest in such land. (*Mueller v. Keller* (1960), 18 Ill. 2d 334, 340.) But, as the court emphasized in that case, courts of equity will restrain the exercise of the legal right to revoke a license when the conduct of the licensor has been such that the assertion of the legal title would operate as a fraud upon the licensee. We are of the opinion that the manifest weight of the evidence in this case does not limit Ann's interest to that of a mere licensee. The record establishes that Wylie and Ann were in exclusive and sole possession of the property in question and not limited to their use or enjoyment of it in any way. Wylie and Ann did all of the landscaping of the property themselves. They solely repaired and maintained the home built on that property. They insured the home under a homeowner's policy and never paid any rent. In addition, Earl at least on one occasion asked permission to go on the property. Earl and Alice did not even have a key to the home. Wylie and Ann made all the loan payments. Moreover, all the parties testified that the home was Wylie and Ann's. Such dominion and control over the property by Wylie and Ann shows a possessory interest that precludes application of a license theory, and the trial judge was correct in rejecting it.

■■ We determine that while he did not denominate it as such, the interest awarded to Ann in the Johnson Road property by the trial judge was an equitable lien. (*Marshall Savings & Loan Association v. Chicago National Bank* (1965), 56 Ill. App. 2d 372.) As this court stated in *Calacurcio v. Levson* (1966), 68 Ill. App. 2d 260, 263:

"The trend of modern decisions is to hold that in the absence of an express contract, a lien based upon the fundamental maxims of equity may be implied and declared by a court of equity out of general considerations of right and justice as applied to the relationship of the parties and the circumstances of their dealing [citation]. An equitable lien is the right to have property subjected in a court of equity to payment of a claim. It is neither a debt nor a right of property, but a remedy for a debt."

The next question posed by this case is the extent or amount of the equitable lien. The trial court ruled that Ann was entitled to one-half of the appraised value of the improvements less the value of the land after making provision for payment of the construction loan.

Earl and Alice argue that if Ann is entitled to restitution her recovery should be measured by the subjective value to them or the value of the labor and materials that went into the house, and not the increased value of the land resulting from the addition of the house.

One scholar has suggested that when one builds a house on another's land, there are at least two feasible objective measures of restitution and one subjective measure. They are (1) the objective value of the labor and

materials which went into the house; (2) the increased value of the land resulting from the addition of the house to it and (3) the personal value to the defendant landowner for his particular purposes. (See Dobbs, Remedies §4.5, at 261 (1973).) We have been supplied no case which has adopted the latter approach perhaps because of the almost impossibility of determining the subjective approach.

The Illinois cases have variously given an equitable lien for (1) the cost of the improvements or (2) the enhanced value of the premises, or (3) a right to purchase the premises if the owner elects to sell. *Pope v. Speiser* (1955), 7 Ill. 2d 231; *Elder v. Clarke* (1944), 385 Ill. 335; *Hayes v. Davis* (1940), 307 Ill. App. 440; *Olin v. Reinecke* (1929), 336 Ill. 530.

In *Olin v. Reinecke* (1929), 336 Ill. 530, the trial court required the legal owner to pay the improver $12,565.22 which was the value of the improvements he placed on the legal owner's land. If the owner did not pay that sum, the property was to be sold, sale expenses paid, the legal owner compensated $4,500 (the present value of his land), the mortgage was to be paid out and the plaintiff-improver was to be paid the balance of the sale proceeds. The supreme court affirmed the trial court's disposition.

In *Hayes v. Davis* (1940), 307 Ill. App. 440, the appellate court held that the improver was entitled to be reimbursed for the improvements placed upon the premises to the amount that such improvements enhanced the value of the real estate. The amount of the enhancement was to be determined as of the time of the hearing.

In *Elder v. Clarke* (1944), 385 Ill. 335, 340, the trial court allowed the improver "all money they actually expended, and in addition $250 for labor, and no charge is made for the actual value of the use of the premises." The supreme court affirmed that award.

In *Pope v. Speiser* (1955), 7 Ill. 2d 231, the supreme court was of the opinion that the trial court should have directed the legal owner to pay the improver the reasonable value of the permanent improvements he placed on the premises and on the legal owners' failure or refusal to do so, the trial court should have ordered the property sold to foreclose the plaintiff's equitable lien.

■■ From the foregoing, we conclude there was an implied promise by Earl and Alice to deed the land in question to Wylie and Ann and that the trial court was correct in imposing an equitable lien on the premises amounting to the value of the improvements that Ann and Wylie constructed thereon, in order to prevent unjust enrichment to Earl and Alice. This conclusion is clearly supported by the evidence presented to the trial court in proving the allegations of the complaint.

■■ It is the opinion of this court that the trial court properly directed defendants Earl and Alice to perform their implied contract to pay the

plaintiff one-half of the reasonable value of the permanent improvements placed on the premises by the plaintiff and her husband and on their failure or refusal so to do, the trial court correctly ordered the property sold to foreclose plaintiff's equitable lien.

■■ Ann asserts that the trial court erred in not finding that Earl and Alice had either made an irrevocable gift of the Johnson Road lot to Wylie and Ann or had promised to make a gift of the lot and were estopped from refusing to complete the gift. In reviewing the evidence in this case, we find it insufficient to establish the existence of a gift of the lot. The trial court was correct in its rulings in this regard.

■■ Earl and Alice next assert that the trial court erred in attaching a lien for Wylie's debts on the Johnson Road property. The trial court placed a lien on one-half of the property for Ann's attorney's fees, child-support arrearage and one-half interest in the teacher's retirement plan. We agree that this was erroneous because an equitable lien is a remedy and not a property right. As was said in *Watson v. Hobson* (1948), 401 Ill. 191, 201, in discussing the nature of an equitable lien:

> "An equitable lien is the right to have property subjected, in a court of equity, to the payment of a claim. It is neither a debt nor a right of property but a remedy for a debt. It is simply a right of a special nature over the property which constitutes a charge or encumbrance thereon, so that the very property itself may be proceeded against in an equitable action and either sold or sequestered under a judicial decree, and its proceeds in one case, or its rents and profits in the other, applied upon the demand of the creditor in whose favor the lien exists."

We have found no case in which a lien was imposed on an equitable lien under such circumstances, as if the latter were a piece of property. Wylie has disclaimed any interest in the Johnson Road property. No matter how obstinate or intractable the trial court may have felt his action was in disclaiming the interest, the trial court cannot create a lien upon an equitable lien where none is sought. That portion of the judgment is reversed.

Wylie asserts that the trial court improperly denied his request for a change of venue. He alleged in a verified petition:

> "That the Respondent feels that he has been belittled and degraded by certain comments made to him and concerning him by this Court;
>
> That the Respondent feels that this Court is prejudiced against him because of the Court's manner and demeanor with regard to the Respondent;
>
> That the Respondent feels that this Court is prejudiced against him is [sic] evidenced by this Court's summary denial of his motion to vacate this Court's denial of a child support reduction without

even giving the Respondent's attorney an opportunity to address the Court and argue the motion to vacate."

■■ Wylie's petition for change of venue was filed after the court had heard testimony regarding temporary relief and upon hearings concerning a rule to show cause. As such, there was no doubt that he was not entitled to an automatic change of venue under the provisions of section 1(2) of the Venue Act (Ill. Rev. Stat. 1979, ch. 110, par. 501(2)).

Section 3 of the Venue Act provides:

> "Every application for a change of venue by a party or his attorney shall be by petition, setting forth the cause of the application and praying for a change of venue, which petition shall be verified by the affidavit of the applicant. A petition for change of venue shall not be granted unless it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case, *provided that if any grounds for such change of venue occurs thereafter, a petition for change of venue may be presented based upon such grounds.*" (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 110, par. 503.)

In *Templeton v. First National Bank* (1977), 47 Ill. App. 3d 443, this proviso was interpreted to require specific allegations to support the charges of prejudice, and that a petition presented after the judge to whom it is presented has ruled on a substantial issue in the case, should be granted only in the sound discretion of the trial court. We determine that the allegations of the instant petition were insufficient to specify prejudice of the trial judge and he did not abuse his discretion in denying it.

Earl and Alice argue that the trial court erred in failing to grant their motion to sever the counts against them from the dissolution count and further erred in denying their motion for change of venue.

The law governing severances of actions is contained in section 51 of the Civil Practice Act which provides:

> "An action may be severed, and actions pending in the same court may be consolidated, as an aid to convenience, whenever it can be done without prejudice to a substantial right." Ill. Rev. Stat. 1979, ch. 110, par. 51.

■■■ The trial court determined that, as a matter of convenience, all issues in this action should be tried together. We agree that it would place an undue burden on the already crowded court calendar to conduct two trials in a case such as this where issues of property ownership involve the same witnesses, the same evidence, and the same arguments. Had these actions been originally brought separately, they would have been properly consolidated. Consolidation of cases in the same court is proper where they are the same nature, arise from the same act or event, involve the same or like issues, and depend largely upon the same evidence.

(*Stone v. City of Belvidere* (1976), 39 Ill. App. 3d 829.) We can discern no prejudice to defendants' rights by the trial court's action and do not view the failure to sever as an abuse of discretion.

■■ As to Earl and Alice's motion for change of venue, they concede the trial court had ruled on a substantial issue before they filed their petition. Their argument that the court abused its discretion in failing to change venue is apparently based upon the fact that they changed attorneys during the pendency of this case. This is simply not a sufficient reason for granting of the petition, and the trial judge did not abuse his discretion in denying it.

Wylie and Ann each appeal the award of attorney's fees in the amount of $3,000, Wylie claiming the award was not justified and Ann claiming that her legal fees exceeded the amount awarded and that she should have been awarded all fees she incurred both in the trial court and on appeal.

Section 508 of the Illinois Marriage and Dissolution of Marriage Act provides that the court may, after considering the financial resources of the parties, order either spouse to pay a reasonable amount for his own costs and attorney's fees and attorney's fees necessarily incurred by the other spouse for the maintenance, defense of a proceeding, enforcement or modification of an order or judgment or the defense of an appeal under the Act. Ill. Rev. Stat. 1979, ch. 40, par. 508(a)(1), (2), (3).

■■ Awards of attorney's fees under this section require consideration of the financial resources of the parties (*In re Marriage of Held* (1979), 73 Ill. App. 3d 561); and are left to the sound discretion of the trial court, reversible only for an abuse of discretion. *Christian v. Christian* (1979), 69 Ill. App. 3d 450; *In re Marriage of Pedersen* (1979), 77 Ill. App. 3d 716.

■ The general rule is that to justify the allowance of attorney's fees, the party seeking relief must show financial inability to pay and the ability of the other spouse to do so. Among the factors to be considered are the nature of the controversy, the question at issue, the significance or importance of the subject matter, the degree of responsibility involved, the standing or skill of the attorney employed and the time and labor involved. (*Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578.) In determining the issue of attorney's fees, the trial court had before it evidence as to the financial circumstances of the parties, including their household expenses, employment compensation and other debts and expenses. The trial court found that Ann, who earned less than Wylie, was financially unable to pay all of her attorney's fees. No question was raised as to the reasonableness of the fees charged to her. In view of the differential in earnings of the parties and their current resources with which to pay the fees, we are of the opinion that the trial court did not abuse its discretion in the amount of the fees awarded.

Ann asserts that she was entitled to an award of maintenance in the present case. Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act provides in pertinent part:

"(a) In a proceeding for dissolution of marriage or legal separation or declaration of invalidity of marriage, or a proceeding for maintenance following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse, the court may grant a maintenance order for either spouse, only if it finds that the spouse seeking maintenance:

(1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and

(2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income." Ill. Rev. Stat. 1979, ch. 40, par. 504(a).

Section 504 of the Marriage Act enumerates certain factors which must be considered by the trial court in determining whether an award of maintenance is justified. These factors include the financial resources of the party seeking maintenance; the standard of living established during the marriage; the age and the physical and emotional condition of both parties and the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance. Ill. Rev. Stat. 1979, ch. 40, par. 504(b).

Wylie contends that the trial court was correct in refusing an award of maintenance since to award maintenance would be contrary to the manifest weight of the evidence. We agree. The court pointed out in *In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 101:

"With respect to Husband's argument that the trial court abused its discretion in denying him maintenance, section 504 of the Act permits an award of maintenance *only* when the court can find that a spouse is unable to support himself through appropriate employment or is otherwise without sufficient income."

■■ The record establishes that the wife was gainfully employed and able to support herself by appropriate employment. We believe that the trial court was correct in denying maintenance under the circumstances shown by this case. *In re Support of McGrew* (1980), 90 Ill. App. 3d 27.

Earl and Alice contend that the trial court was in error in appointing a receiver to take control of the Johnson Road property. Although the case law supports the proposition that the appointment of a receiver by the trial court was not in error, the question of that appointment is at this time moot.

In sum, we affirm the circuit court of Kendall County's disposition of every issue raised on appeal by all parties, except that relating to the attachment of a lien on Wylie Robinson's interest in the Johnson Road improvements which we reverse. The cause is remanded for further proceedings as may be necessary to conclude this matter.

Affirmed in part; reversed in part and remanded.

SEIDENFELD, P. J., and LINDBERG, J., concur.